# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

TERRY NUNNELLY,             )
                                 )
        Plaintiff,         )
                                 )
     vs.                   )    Case No. 4:19-cv-01383-HNJ
                                 )
LIFE INSURANCE COMPANY OF   )
NORTH AMERICA,          )
                                 )
       Defendant.      )

## MEMORANDUM OPINION

This action proceeds before the court on Plaintiff Terry Nunnelly's Motion for Judgment on LTD Benefits for Inability to Perform Own Occupation, (doc. 31), and Motion to Strike Affidavit and Portions of Affidavit of Richard Lodi, (doc. 45); and Defendant Life Insurance Company of North America's Motion for Summary Judgment. (Doc. 35). Nunnelly filed this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking long-term disability benefits under an employee welfare benefit plan provided by his employer, Honeywell International, Inc. ("Honeywell"), and insured by Life Insurance Company of North America ("LINA"). Nunnelly beseeches the court to reverse LINA's adverse decision denying his claim for long-term disability benefits. LINA bids the court to affirm its decision.

Because the evidence fails to depict Nunnelly sustained a continuous disability

during the pertinent period, LINA properly determined he did not establish an entitlement to long-term disability benefits. The court therefore **DENIES** Nunnelly's Motion for Judgment on LTD Benefits for Inability to Perform Own Occupation and **GRANTS** LINA's Motion for Summary Judgment. The court further **GRANTS IN PART** and **DENIES IN PART** Nunnelly's Motion to Strike Affidavit and Portions of Affidavit of Richard Lodi.

## STANDARD OF REVIEW

The general principle of Federal Rule of Civil Procedure 56 – that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" – has limited application in an ERISA case, as the district court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.*, No. 04-14097, 2005 U.S. App. LEXIS 29623, *18–19 (11th Cir. Mar. 16, 2005) (unpublished per curiam opinion) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002)).

To that end, the Eleventh Circuit's six-step sequential framework for reviewing ERISA benefit denials guides the court:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision was "wrong" (i.e., the court

disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). The court

undertakes the review by considering "the material available to the administrator at the

time it made its decision." *Id.* Moreover, the claimant sustains the burden of proving

entitlement to ERISA benefits. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241,

1248 (11th Cir. 2008).

## FACTUAL BACKGROUND

### A.    The Benefits Policy

LINA insures the long-term disability ("LTD") component of Honeywell's

employee welfare benefit plan ("the Plan") via Group Policy No. VDT-980084 (the "Policy"). (Doc. 36 at 2). LINA issued the Policy to the Trustee of the Group Insurance Trust for Employers in the Manufacturing Industry, to which Honeywell subscribes. (*Id.*) Honeywell constitutes the Plan Administrator, (AR 0085),[1] and LINA constitutes the claims administrator that adjudicates benefit claims. (Doc. 36 at 3).[2]

---

[1] Citations to "AR" refer to the administrative record of Nunnelly's claim, filed as documents 24-1 through 24-15. For ease of reference, the court cites to the page number of the administrative record rather than to the page number of the CM/ECF paginated documents.

[2] The correspondences Nunnelly received regarding his LTD claim depict the name "Cigna" beneath a symbol of a tree. *See, e.g.*, AR 1184, 1197. Presumably based upon this mark, Nunnelly contends Cigna constituted the "decision maker" that denied his claim. Doc. 31 at 7; *see* doc. 50 at 9, 14 ("CIGNA made the decision to deny benefits, not LINA."). Nunnelly also argues Cigna "makes eligibility decisions" on LINA's behalf. (Doc. 33 at 28). Yet, throughout his filings, Nunnelly also maintains LINA "determines eligibility" for benefits and rendered the adverse decision. Doc. 31 at 7; *see* doc. 33 at 35 ("LINA failed to review all the available evidence . . . LINA has the authority to approve benefits . . . ."); doc. 50 at 29 ("LINA had an obligation to consider . . . Nunnelly's SSDI Award . . . ."); *id.* at 31 ("LINA's Decision was not Reasonable"). Nunnelly thus explicitly recognizes LINA adjudged his claim – which he implicitly acknowledged by naming LINA as the defendant in this action – his contrary statements notwithstanding. *See Milton v. Life Ins. Co. of N. Am.*, No. CV-12-BE-864-E, 2012 U.S. Dist. LEXIS 85561, at *3 (N.D. Ala. June 20, 2012) ("As the party with decisional control over the Plaintiff's benefits claim, LINA is the only proper defendant in an action concerning ERISA benefits.").

Moreover, as LINA highlights, the correspondences depicting Cigna's name beneath the tree symbol contain a footer stating: "'Cigna' and the 'Tree of Life' logo are registered service marks of Cigna Intellectual Property, Inc., licensed for use by Cigna Corporation and its operating subsidiaries. All products and services are provided by or through such operating subsidiaries, including [LINA], . . . and not by Cigna Corporation." (Doc. 49 at 7–8) (quoting AR 1184, 1291). This language expressly clarifies LINA provided the claims administration services, and simply printed the "Cigna" service mark on its correspondences. Further, in its Answer, LINA admitted it served as the claims administrator and denied Nunnelly's LTD claim. (Doc. 4 ¶¶ 2, 5). Nunnelly fails to present any evidence undermining LINA's role or otherwise establishing that Cigna served as the claims administrator. The court therefore rejects Nunnelly's arguments that Cigna maintained any role in adjudicating his claim. *See Lockner v. Swift Tech. Servs., LLC*, 326 F. Supp. 3d 912, 915–18 (D. Alaska 2018) (the plaintiff improperly named Cigna as a party defendant to his ERISA action because LINA provided the claims administration services and merely printed the "Cigna" service mark on its

The Policy provides:

> [LINA] will pay Disability Benefits if an Employee becomes Disabled while covered under [the] Policy. The Employee must satisfy the Elimination Period . . . and meet all the other terms and conditions of the Policy. He or she must provide [LINA], at his or her own expense, satisfactory proof of Disability before benefits will be paid. . . .

(AR 0022). The Elimination Period constitutes "the period of time an Employee must be continuously Disabled before Disability Benefits are payable." (*Id.*) As relevant here, the Policy prescribed a twenty-six week Elimination Period for benefits claims. (AR 0006).

The Policy defines "Disability" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
> 1.    unable to perform the material duties of his or her Regular Occupation; and
> 2.    unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
> 1.    unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2.    unable to earn 80% or more of his or her Indexed Earnings.

---

correspondences); *accord McCoy v. Mallinckrodt Pharms., Inc.*, No. 2:15-cv-00723-MHT-PWG, 2016 U.S. Dist. LEXIS 50442, at *15–19 (M.D. Ala. Mar. 23, 2016); *Melech v. Life Ins. Co. of N. Am.*, No. 10-0573-KD-M, 2011 U.S. Dist. LEXIS 28492, at *19–24 (S.D. Ala. Mar. 1, 2011); *see also Moore v. Life Ins. Co. of N. Am.*, No. 6:18-cv-143-Orl-28TBS, 2018 WL 8582741, at *2 (M.D. Fla. May 1, 2018) (The court dismissed the plaintiff's ERISA claim against Cigna because it constituted "a registered service mark and not a legal entity that has a separate legal existence.").

(*Id.*)

Further, pursuant to the Plan:

[Honeywell] . . . appointed [LINA] as the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. [LINA] shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decision made by [LINA] shall be final and binding on Participants and Beneficiaries to the full extent permitted by law.

(AR 0086).

## B.    Claim History

Honeywell employed Nunnelly as a Mechanic III until he ceased working on January 18, 2017. (AR 0753). Adopting the standards set forth in the Dictionary of Occupational Titles, Honeywell classified the Mechanic III position as a "Medium Work level occupation." (AR 1185). Medium Work entails occasionally exerting twenty to fifty pounds of force to move objects; and/or frequently exerting ten to twenty-five pounds of force to move objects; and/or constantly exerting up to ten pounds of force to move objects. (*Id.*)

Nunnelly telephonically applied for LTD benefits on November 14, 2017.[3] (AR 0765). On November 20, 2017, LINA sent Nunnelly a letter acknowledging his

---

[3] Prior to submitting his LTD benefits claim, Nunnelly pressed a claim for short-term disability ("STD") benefits based upon migraine headaches. (AR 0746, 0752–57). LINA resolved Nunnelly's STD benefits claim, which stands "fully satisfied" pursuant to another lawsuit and does not pose an issue in this matter. (Doc. 36 at 7).

application, and requesting that he complete a Disability Questionnaire and Activities of Daily Living Form. (AR 0811–13). The letter further stated that LINA would contact Nunnelly's psychiatrist to obtain pertinent medical records, and notified Nunnelly that he remained "responsible for ensuring [LINA] receive[d] the requested information within 45 days of the request." (AR 0811). Nunnelly did not respond to LINA's request, and, on December 13, 2017, and January 11, 2018, LINA sent him additional letters requesting medical records and other supporting documents vis-à-vis his claim. (AR 1036–37, 1134–35). In addition, LINA directly contacted Nunnelly's care providers on multiple occasions to request medical records. (AR 0866–67, 0874–75, 0885, 1048–49, 1054–55, 1142–43).

On January 8, 2018, Nunnelly completed a paper application for LTD benefits. (AR 1126–27). He did not specify any disabling impairments on the application, and identified only his psychiatrist as a treating physician. (AR 1126). LINA effected review of medical records it obtained from Nunnelly's care providers via two of its employees: Shadrach H. Jones, IV, M.D., an Associate Medical Director for LINA board certified in internal medicine with a specialty in occupational and environmental medicine, (AR 1148–50), and Licensed Professional Counselor Brandi Mitchell, who specializes in behavioral health. (AR 0319). After reviewing Nunnelly's medical records – including those pertaining to his STD claim – portraying treatment for bipolar disorder, anxiety,

depression, migraines, and neck pain, LINA denied Nunnelly's LTD claim on January 26, 2018.[4] (AR 1184–88).

On July 23, 2018, Nunnelly appealed LINA's denial. (AR 1210, 1213–14, 1223). On August 23, 2018, Nunnelly submitted additional medical records and notified LINA he had "no [further] medical evidence to submit."[5] (AR 1245). In addition, he informed LINA he could not afford medical treatment due to a lack of income. (*Id.*)

On appeal, LINA effected review of Nunnelly's medical records by engaging third-party consultants M. Antoinette Acenas, M.D., board certified in psychiatry, (AR 1235–37), and Dr. Leonid Topper, M.D., board certified in neurology. (AR 1240–43). On September 20, 2018, after consideration of Nunnelly's medical records and the opinions of the independent medical reviewers, LINA upheld the denial of LTD benefits.[6] (AR 1291–94).

On March 11, 2019, Nunnelly submitted additional medical records depicting

---

[4] Pursuant to the twenty-six week Elimination Period discussed previously, the Policy required Nunnelly to establish a continuous disability during the period January 18, 2017, to July 19, 2017, to receive LTD benefits. (AR 1292) ("Under the terms of the policy, the Elimination Period is 26 weeks. Mr. Nunnelly's Elimination Period began on January 18, 2017[,] and ended on July 18, 2017[;] therefore[,] the benefit start date would have been July 19, 2017.").

[5] A portion of Nunnelly's August 23, 2018, submission comprised legible copies of illegible records already in LINA's possession. (AR 1245).

[6] LINA's September 20, 2018, affirmance letter notified Nunnelly of his optional right to submit a second appeal request. (AR 1293). The letter instructed Nunnelly that to initiate the second appeal request, he must "[s]ubmit [an] appeal letter . . . within 180 days of [his] receipt of [the September 20, 2018, affirmance] letter." (*Id.*)

psychiatric treatment during the period June 2018 to February 2019. (AR 1302–25). A cover letter prefacing the submission states, "Mr. Nunnelly has not been awarded Social Security disability benefits. This week [he] received the enclosed records from [psychiatric practice] Grayson & Associates, P.C. for visits on 6/6/18, 6/13/18, 8/18/18, 11/7/18, and 2/4/19. [He] [has] no additional records to submit." (AR 1302). On March 20, 2019, LINA notified Nunnelly it would not regard the submission as a second appeal request because he did not furnish "a formal written request to appeal the September 20, 2018, appeal affirmation." (AR 1326). On July 23, 2019, Nunnelly commenced the instant action by filing a Complaint in the Circuit Court of Etowah County, Alabama. (Doc. 1-1). LINA removed the action to this court on August 26, 2019. (Doc. 1).

C.    **The Medical Evidence from Nunnelly's Care Providers**

As referenced previously, the administrative record comprises medical evidence from Nunnelly's treating physicians. Dr. Glenn O. Archibald, M.D., specializes in psychiatry.[7] Dr. Gaylyn Horne Ballard, M.D., specializes in pain management.[8] Dr. Fazal Rahim, M.D., specializes in neurology.[9]

---

[7] The administrative record contains Dr. Archibald's records at AR 0935–75, 1101–08, and 1192–94.

[8] The administrative record contains Dr. Horne Ballard's records at AR 1246–90.

[9] The administrative record contains Dr. Rahim's records at AR 0912, 0978–83, 1024, and 1163–76.

**Dr. Glenn O. Archibald**

Dr. Glen O. Archibald treated Nunnelly at Grand View Behavioral Health for bipolar disorder, anxiety, depression, and related psychiatric symptoms. Dr. Archibald's pertinent records comprise treatment notes from the period March to June 2017, and a February 29, 2018, opinion statement.[10] During a March 9, 2017, appointment, Nunnelly reported he felt "angry, irritable, . . . stuck, [and] hopeless." (AR 1104). He further reported he "[could not] sleep, and [was] not eating." (*Id.*) Dr. Archibald noted Nunnelly exhibited depression, anxiety, agitation, fair insight and judgment, suicidal ideation, pressured thought process, and an unkept appearance. (*Id.*) Dr. Archibald "offered" Nunnelly inpatient treatment and recommended he continue his existing psychiatric medication regimen. (*Id.*)

On May 8, 2017, Nunnelly reported he recently experienced "a lot of stress because of theft in [his] neighborhood." (AR 1103). Nunnelly reported he "became severely paranoid," slept with a gun, and experienced visual hallucinations. (*Id.*) He

---

[10] The record portrays Nunnelly received psychiatric treatment from Dr. Archibald and other providers at Grand View Behavioral Health during the period February 2009 to December 2016. (AR 0935–75). The records from this period comprise handwritten progress notes, prescription slips, and billing code sheets. (*Id.*) The progress notes remain partially illegible; however, the legible notes depict Nunnelly's psychiatric medication treatment, and various complaints of bipolar disorder, depression, and pain-related symptoms. (*Id.*)

In June 2017, Dr. Archibald left Grand View Behavioral Health to commence practice at Grayson & Associates, P.C. (AR 0777). Prior to adjudicating Nunnelly's claim, LINA confirmed he did not seek treatment with Dr. Archibald at Grayson & Associates, P.C. after his June 5, 2017, appointment with Dr. Archibald at Grand View Behavioral Health. (AR 0873, 1426).

exhibited fair insight, poor judgment, an anxious and depressed mood, a loose and tangential thought process, and an unkempt appearance. (*Id.*) Dr. Archibald noted Nunnelly was unable to work. (*Id.*)

During a May 22, 2017, follow-up appointment, Nunnelly exhibited hypersomnolence, fair insight and judgment, a tangential thought process, audio/visual hallucinations, and an unkempt appearance. (AR 1102). Dr. Archibald decreased Nunnelly's antipsychotic medication dosage and indicated he was "not ready to return to work." (*Id.*)

Nunnelly returned for a follow-up appointment on June 5, 2017. (AR 1001). Nunnelly exhibited a depressed and anxious mood, hypersomnolence, and a slowed thought process. (*Id.*) He demonstrated good insight; he was oriented to person, place, and time; and his appearance was appropriate. (*Id.*) Dr. Archibald noted the decreased dosage of Nunnelly's antipsychotic medication helped his audio/visual hallucinations. (*Id.*) Dr. Archibald noted Nunnelly could not return to work until his hypersomnia subsided. (*Id.*) Dr. Archibald also cited Nunnelly's poor concentration and focus as factors contributing to his inability to work. (*Id.*)

On February 19, 2018, Dr. Archibald opined that based upon his June 5, 2017, examination of Nunnelly, Nunnelly remained unable to work due to the "severity of [his] auditory/visual hallucinations, high level[s] of panic [and] anxiety, and mood

swings." (AR 1192–93).

**Dr. Gaylyn Horne Ballard**

Dr. Gaylyn Horne Ballard's relevant records portray she treated Nunnelly for pain during the period January 2017 to April 2017.[11] (AR 1281–90). During a January 2, 2017, appointment, Nunnelly reported increased pain in his neck, head, and right shoulder. (AR 1281). Sitting, lying, bending, twisting, sleeping, exercise, work, and physical activity exacerbated his pain. (*Id.*) Medication, heat, ice, rest, and massage therapy relieved his pain. (*Id.*) Dr. Horne Ballard noted Nunnelly's bipolar and anxiety remained stable with medications. (*Id.*) She further noted "[p]ain medication provides relief and improves daily function," and "[a]nalgesia allows for [a] more active lifestyle and [the] ability to participate in more activities of daily living, [thus] increasing quality of life." (*Id.*) Dr. Horne Ballard encouraged Nunnelly to exercise and remain "as active as possible." (AR 1282).

Nunnelly returned for follow-up appointments on January 30, February 22, March 22, and April 19, 2017, complaining of ongoing neck pain and migraines. (AR

---

[11] The record portrays Nunnelly established care with Dr. Horne Ballard in July 2015 and attended routine follow-up appointments through December 2016. (AR 1246–80). Dr. Horne Ballard's treatment notes from this period reflect Nunnelly's various complaints of severe migraines, and neck, shoulder, and back pain. (AR 1246, 1248–49, 1251, 1253–55, 1257, 1259, 1261, 1263, 1265, 1267, 1269 , 1271, 1273, 1275, 1277, 1279). Dr. Horne Ballard consistently prescribed Nunnelly pain medication; noted medication decreased his pain and/or increased his capacity for daily living activities; and encouraged him to exercise and remain as active as possible. (AR 1247–49, 1250, 1252, 1254–56, 1258–60, 1262–80).

1283, 1285, 1287).  Nunnely also complained of shoulder pain during his April 19, 2017, appointment.  (AR 1289).  During all four appointments, Nunnely described his neck pain as ongoing and sometimes severe, and reported his migraines could be "debilitating" and "incapacitating."  (AR 1283, 1285, 1287, 1289).  Nunnely scored his pain level at 10/10 at the height of a migraine cycle, and reported his migraines exacerbated pain in his spine.  (*Id.*)  Dr. Horne Ballard consistently noted Nunnely's bipolar and anxiety remained stable, and she observed that his psychiatric symptoms improved with medication and pain management.  (*Id.*)  Dr. Ballard further noted medication improved Nunnely's pain, and he tolerated medication well.  (*Id.*)  She again observed that analgesia permitted a more active lifestyle and an increased quality of life, and encouraged Nunnely to exercise and remain as active as possible.  (AR 1283–89).

**Dr. Fazal Rahim**

Dr. Fazal Rahim's relevant records comprise January 19 and March 2, 2017, treatment notes, and February 8 and March 19, 2017, evaluations of Nunnely's limitations and ability to work.[12]  On January 19, 2017, Nunnely presented at an

---

[12] The record portrays Dr. Rahim also treated Nunnely in August, September, and November 2016. (AR 1163–76).  In pertinent part, Dr. Rahim's treatment notes portray Nunnely variously complained of migraines, numbness, and neck, back, and shoulder pain.  (AR 1165, 1171–74).  Dr. Rahim consistently noted Nunnely displayed a tangential affect.  (AR 1168, 1171, 1175).  Nunnely exhibited tenderness in his right neck and shoulder during a November 22, 2016, follow-up appointment, (AR 1165), and displayed no musculoskeletal symptoms or weakness during the previous appointments. (AR 1168, 1171, 1175).  Dr. Rahim regularly prescribed Nunnely various pain medications, including Botox injections for his migraines.  (AR 1166, 1169, 1171–72, 1176).  Nunnely reported worsening migraine-related symptoms during his November 22, 2016, appointment.  (AR 1165).

13

appointment complaining of migraines and worsening associated symptoms, such as jaw and face pain. (AR 0981–82). Nunnelly reported experiencing three to four "bad migraines" weekly, resulting in absences from work. (AR 0982). His medications provided little relief, and he reported "feeling more edgy and close to a break down due to constant head pain." (*Id.*) Nunnelly exhibited tenderness in his right neck and shoulder; displayed "obvious distress"; and cried due to pain. (AR 0983). He did not exhibit any facial or motor weakness, and his neck muscles displayed no abnormalities. (*Id.*) Dr. Rahim assessed Nunnelly with migraines and shoulder pain, and prescribed leave of work until March 6, 2017. (*Id.*)

On February 8, 2017, at LINA's behest, Dr. Rahim submitted a Medical Request Form evaluating Nunnelly's limitations and ability to work. (AR 1024). He diagnosed Nunnelly with refractory migraines, and specified that daily headaches and neck pain affected Nunnelly's ability to work. (*Id.*) Dr. Rahim restricted Nunnelly from prolonged standing, sitting, and bending, and exposure to lights and noise. (*Id.*) He indicated that Nunnelly could return to work immediately with accommodations for his restrictions. (*Id.*) He further opined Nunnelly could return to work on March 6, 2017, with restrictions. (*Id.*)[13]

---

[13] Dr. Rahim's opinion portrays a potential anomaly. The Medical Request Form poses two pertinent questions: "Could [Nunnelly] return to work at this time if accommodations were made for the listed restrictions? . . . If no, based on your experience, what is your best estimate of when [Nunnelly] can return to work?" (AR 1024). Dr. Rahim checked the box indicating "Yes" in response to the first

Nunnelly presented at a follow-up appointment on March 2, 2017. (0978). He reported jaw pain, and frequent headaches that required him to rest and sleep several times a week. (0979). The pain affected his ability to sleep, and he reported poor sleep for two to three-day periods due to pain. Medication improved his headaches "some." (*Id.*) His bipolar disorder remained stable. (*Id.*) He reported new numbness in his right thigh. (*Id.*)

Upon examination, Nunnelly manifested tenderness in his right neck and shoulder, and exhibited a reduced range of motion in his spine. (AR 0980). He exhibited obvious distress and tangential mania symptoms. (*Id.*) He did not exhibit any facial or motor weakness, and his neck muscles displayed no abnormalities. (*Id.*) Dr. Rahim assessed Nunnelly with migraines, chronic neck pain, syringomyelia,[14] and bipolar disorder. (*Id.*) He noted Nunnelly's migraines precluded him from working, and indicated he could not return to work until June 5, 2017. (*Id.*)

---

question; yet, he nonetheless answered the second question by opining Nunnelly could return to work with restrictions on March 6, 2017. (*Id.*) Based upon Dr. Rahim's responses, the court cannot discern whether Dr. Rahim inadvertently indicated Nunnelly could immediately return to work with restrictions, or whether, as LINA posits, Dr. Rahim "simultaneously opined" that Nunnelly could return to work with restrictions both immediately and on March 6, 2017. (Doc. 36 at 6). However, this ambiguity does not affect the court's analysis because, as elaborated below, Dr. Rahim ultimately extended Nunnelly's work restrictions to June 1, 2017.

[14] Syringomyelia refers to "a disorder in which a fluid-filled cyst (called a syrinx) forms within the spinal cord," which may cause pain, headaches, numbness, and other symptoms. https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Syringomyelia-Fact-Sheet (last visited June 3, 2021).

On March 19, 2017, Dr. Rahim submitted another Medical Request Form stating that due to Nunnelly's daily headaches and neck pain, he could not lift more than five pounds; and he could not sit or stand for more than one hour at a time, and for more than two to three hours per day. (AR 0912). Dr. Rahim indicated Nunnelly could not immediately return to work with accommodations for his restrictions, as he required "frequent breaks and bed rest." (*Id.*) Dr. Rahim stated Nunnelly could return to work with restrictions on June 1, 2017. (*Id.*)

### D.     The Medical Reviewers' Reports

### Dr. Shadrach H. Jones, IV

Dr. Shadrach H. Jones, IV rendered an opinion regarding Nunnelly's functional limitations on January 16, 2018, as part of LINA's initial review of Nunnelly's claim. (AR 1148–50). Dr. Jones reviewed Drs. Rahim's and Horne Ballard's treatment records. (AR 1148). Dr. Jones noted that at Nunnelly's most recent, March 2, 2017, appointment with Dr. Rahim, Nunnelly did not display any obvious distress, ataxia in the arms or legs, tremor, or bradykinesia. (*Id.*) Nunnelly exhibited a normal gait with no imbalance; a normal cranial nerve exam; normal motor tone, bulk, and power; normal speech and language; normal sensation, and symmetric reflexes. Dr. Jones further noted Nunnelly manifested a reduced range of motion in the cervical spine and tangential mania symptoms. (*Id.*)

In addition, Dr. Jones noted that according to Dr. Horne Ballard's February 22, 2017, treatment notes, medication improved Nunnelly's pain and his capacity for daily living activities. (*Id.*) Dr. Jones further heeded Dr. Horne Ballard's observations that Nunnelly displayed a normal mental status, normal pupils, clear lungs, normal heart sounds, nontender abdomen, and a decreased range of motion of the cervical spine. (*Id.*)

Dr. Jones opined that Nunnelly did not manifest any functional limitations, and concluded the record undermined Dr. Rahim's opinion that Nunnelly could not return to work until June 2017.[15] (AR 1149). Dr. Jones elaborated that Nunnelly's examinations revealed no abnormalities or neurological deficits. (*Id.*) He also highlighted Dr. Horne Ballard's representation that medication controlled Nunnelly's migraines, and her recommendation that Nunnelly maintain an active lifestyle. (*Id.*) Dr. Jones thus did not prescribe any medically necessary restrictions vis-à-vis Nunnelly's ability to sit, stand, walk, reach, handle, lift, carry, push, pull, balance, stoop, crouch, squat, crawl, kneel, see, hear, climb stairs and ladders, or operate foot controls. (*Id.*)

---

[15] Dr. Jones did not specify whether he discredited Dr. Rahim's March 2, 2017, opinion that Nunnelly could not work until June 5, 2017; his March 19, 2017, opinion that Nunnelly could not work until June 1, 2017; or both opinions. (AR 1149).

**Licensed Professional Counselor Brandi Mitchell**

Licensed Professional Counselor Brandi Mitchell assessed Nunnelly's psychiatric functional limitations on January 11, 2018, as part of LINA's initial review. (AR 0318). Based upon records depicting Nunnelly exhibited abnormal thought processes, pressured speech, intermittent suicidal ideation, paranoia, hallucinations, and other psychiatric symptoms, Mitchell determined Nunnelly sustained a psychiatric functional impairment during the period January 18, 2017, to June 5, 2017, the date of his last visit with Dr. Archibald. (AR 0319). Because the record depicted Nunnelly discontinued psychiatric treatment after June 5, 2017, Mitchell stated she could not comment on his functional impairments beyond that date. (*Id.*)

**Dr. M. Antoinette Acenas**

Dr. M. Antoinette Acenas assessed Nunnelly's psychiatric functional limitations on September 13, 2018, as part of LINA's appellate review. (1235–37). Based upon a review of Nunnelly's records, Dr. Acenas determined Nunnelly satisfied the DSM-5[16] criteria for major depressive disorder with psychotic features, and noted his psychosocial stressors included unemployment and chronic pain. (AR 1236). However,

---

[16] The "DSM-5" refers to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, which "defines and classifies mental disorders in order to improve diagnoses, treatment, and research." https://www.psychiatry.org/psychiatrists/practice/dsm (last visited June 4, 2021). The DSM "is generally considered the accepted authority on mental health diagnosis." 13 ROSCOE N. GRAY & LOUISE J. GORDY, ATTORNEYS' TEXTBOOK OF MEDICINE § 112.04 (3d ed. 2020).

Dr. Acenas concluded Nunnelly did not manifest a mental, cognitive, and/or behavioral impairment. (*Id.*) Dr. Acenas noted that Dr. Archibald's mental status examinations of Nunnelly revealed no abnormalities other than an anxious and depressed mood, and paranoid thoughts. (*Id.*) In addition, Dr. Acenas highlighted that Dr. Archibald did not elaborate upon Nunnelly's visual and auditory hallucinations; thus, such symptoms remained unsubstantiated. (*Id.*)

Likewise, Dr. Acenas noted that Dr. Archibald did not elaborate upon his February 19, 2018, opinion that, based upon his June 5, 2017, examination of Nunnelly, Nunnelly could not work due to hallucinations. (*Id.*) Finally, Dr. Acenas observed that Dr. Archibald's June 5, 2017, notes portray Nunnelly's "anxiety and depression were not of the severity [or] intensity that required a higher level of psychiatric intervention[,] such as inpatient psychiatric hospitalization or referral to an intensive outpatient program[,] which one would expect to see if there was a psychiatric impairment from 1/18/17 to the present."[17] (AR 1236–37).

**Dr. Leonid Topper**

Dr. Leonid Topper assessed Nunnelly's functional neurological limitations on September 13, 2018, as part LINA's appellate evaluation. (AR 1240–43). Based upon

---

[17] Dr. Acenas acknowledged that Nunnelly's inability to afford medical treatment "could possibly explain . . . the absence of clinical notes [of] psychiatric relevance since" Dr. Archibald's June 5, 2017, record. (AR 1236).

a review of Nunnelly's medical evidence, Dr. Topper opined the record supported Dr.

Rahim's no-work restriction for only a period spanning January 18, 2017, to April 19,

2017. (AR 1242). Dr. Topper noted that although Dr. Rahim's January and March

2017 notes portray Nunnelly's complaints of severe migraines and neck pain, Dr. Horne

Ballard's April 19, 2017, record depicts that medication improved and controlled

Nunnelly's pain. (*Id.*) Dr. Topper further highlighted that the record did not contain

any pain management or neurology treatment notes after April 19, 2017. (*Id.*)

## DISCUSSION

### A.     The Court May Consider the Declaration of Richard M. Lodi

At the outset, the court addresses Nunnelly's Motion to Strike Affidavit and

Portions of Affidavit of Richard Lodi. (Doc. 45). LINA submitted the Declaration of

Richard M. Lodi in support of its Motion for Summary Judgment.[18] (Doc. 34-1). In his

Declaration, Lodi avers he serves as LINA's Senior Operations Representative; sets

forth his personal knowledge of LINA's claims administration process; describes

---

[18] To clarify, LINA submitted a declaration Lodi executed pursuant to 28 U.S.C. § 1746, and not an affidavit, as Nunnelly's Motion suggests. *See* 28 U.S.C. § 1746(2) ("Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)'.").

LINA's practice of maintaining records; avers the copy of Nunnelly's administrative record is "true and correct"; and discusses LINA's adjudication of Nunnelly's claim. (*Id.*)  Nunnelly beseeches the court to strike the Declaration on the bases that LINA failed to identify Lodi in its initial disclosures, and the Declaration contains inadmissible hearsay.  The court finds partial merit in only Nunnelly's latter contention.

First, LINA's failure to disclose Lodi's identity does not warrant striking the Declaration.[19]  As relevant here, Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to disclose the identity and contact information of "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i).  A party who fails to identify a witness pursuant to Rule 26(a)(1)(A)(i) may not use the witness "to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).  A failure to disclose generally stands harmless "when there is no prejudice to the party entitled to the disclosure." *Little v. City of Anniston*, No. 1:15-CV-954-VEH, 2016 U.S. Dist. LEXIS 177067, at *6 (N.D. Ala. Dec. 22, 2016) (quoting *Coleman v.*

---

[19] LINA does not dispute it did not identify Lodi in its initial disclosures.

21

*Home Depot U.S.A., Inc.*, No. 1:15-CV-21555-UU, 2016 U.S. Dist. LEXIS 121448, at *1 (S.D. Fla. Mar. 21, 2016)).

Here, LINA demonstrates its failure to disclose Lodi's identity did not prejudice Nunnelly, and, therewith, remains harmless insofar as Lodi merely certifies the authenticity of the administrative record. LINA avers it submitted the Declaration not as substantive evidence supporting the merits of its Motion for Summary Judgment, "but rather to authenticate the policy documents and claims file comprising the Administrative Record before LINA at the time it made its decision, as well as certain documents submitted after LINA made its final determination on September 20, 2018." (Doc. 51 at 5). Pertinent averments in the Declaration accord with LINA's representation, as Lodi's declaration certifies the authenticity of LINA's administrative file regarding Nunnelly's claim. Because LINA employed Lodi's testimony to authenticate the administrative record, its failure to disclose Lodi's identity to Nunnelly manifests harmlessly in this regard.[20] *See Davis v. Hartford Life & Accident Ins. Co.*, No.

_____

[20] Indeed, as LINA highlights, the Eleventh Circuit noted that "[o]btaining a complete and accurate record is best accomplished . . . with a certified record or affidavit from the administrator that the complete and accurate record has been compiled and presented." *Williamson v. Travelport, LP*, 953 F.3d 1278, 1290 (11th Cir. 2020) (citing *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997) ("[I]t is the plan administrator's responsibility to compile a record that he is satisfied is sufficient for his decision. . . . [A]s a practical matter, the plan administrator is ordinarily best-positioned to submit that administrative record."); *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457–58 (6th Cir. 2003) (a court can consider the administrative record identified by an affidavit from an individual, so long as the individual has personal knowledge of the contents of that record); Leland E. Beck, A*gency Practice and Judicial Review of Administrative Records in Informal Rulemaking*, Report for the Admin. Conf. of the U.S. at pp. 60, 78 (May 14, 2013) (explaining that in the administrative law context, agency officials

3:14-CV-507-CHB, 2019 U.S. Dist. LEXIS 135388, at *21 (W.D. Ky. Aug. 12, 2019) (the court denied the plaintiff's motion to strike the corporate representative's declaration because although the defendant failed to disclose the representative's identity, the representative merely testified to the claims administration process; thus, the defendant's nondisclosure worked no harm to the plaintiff); *Plumbers & Pipefitters Union No. 421 Health & Welfare Fund v. Brian Trematore Plumbing & Heating, Inc.*, No. 5:11-CV-221(HL), 2013 U.S. Dist. LEXIS 43078, at *9 (M.D. Ga. Mar. 27, 2013) (The defendant's failure to disclose documentary evidence was harmless because the evidence did not "present any danger or surprise or prejudice" to the plaintiffs.); *c.f. Haman, Inc. v. Chubb Custom Ins. Co.*, No. 2:18-CV-01534-KOB, 2020 U.S. Dist. LEXIS 141137, at *21 (N.D. Ala. Aug. 7, 2020) (the plaintiff's failure to disclose certain expert information was not harmless pursuant to Rule 37 because it hindered the defendant's ability to adequately dispose the expert).

However, the court heeds Nunnelly's contentions regarding the balance of Lodi's averments that LINA: adjudges LTD claims, adjudged Nunnelly's STD claim, and reviewed all available records and documents when it handled Nunnelly's LTD claim.

---

submit affidavits to guarantee "completeness and correctness" of the administrative record); 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2723 (4th ed., August 2019 update) ("When a summary-judgment motion relies on . . . administrative records, those records either must be certified or properly subject to the judicial-notice doctrine.")). Pursuant to the foregoing authority, LINA properly submitted Lodi's Declaration to authenticate Nunnelly's administrative record. Furthermore, Nunnelly does not challenge the authenticity of the administrative record.

(Doc. 45 at 1–2).  These particular attestations proceed beyond the certification of the administrative record as they describe LINA's process of adjudging claims, and in particular, Nunnelly's claims.  Because LINA failed to disclose Lodi as a witness vis-à-vis those matters, the court will not consider his testimony in this regard.  Nonetheless, the disallowance of Lodi's attestations on the applicable matters bears no affect upon the balance of the determination at bar.

Finally, the challenged certification in Lodi's Declaration does not constitute inadmissible hearsay.  "'Hearsay' means a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "[T]he party opposing relevant evidence bears the burden of persuasion on the question of whether the evidence constitutes 'hearsay' as that term is defined in Rule 801(c). . . . Once the opposing party has offered a colorable argument that a proffered statement is hearsay, the judge must decide the question under Federal Rule of Evidence 104(a)." 30B FEDERAL PRACTICE & PROCEDURE EVIDENCE § 6712.

LINA's administrative claim file for Nunnelly constitutes a record of a regularly conducted activity pursuant to Federal Rule of Evidence 803(6), which excepts such records from the hearsay rule.  The proponent of the records must establish that such records qualify under Rule 803(6) by proffering "the testimony of the custodian [of the

records] or another qualified witness, or by a certification that complies with Rule 902(11) . . . ." Fed. R. Evid. 803(6)(D). Rule 902(11) deems as self-authenticated an "original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."

Lodi's Declaration constitutes the certification and authentication required by Rules 803(6) and 902(11), as Lodi attests and certifies (i.e., both methods under the rules) that "LINA maintains records in the ordinary course of business relative to claims for benefits, which records are made at the time of the acts, transactions, occurrences and/or events reflected in the records, or within a reasonable time thereafter, by someone with personal knowledge of such acts, transactions, occurrences and/or events." (Doc. 34-1 at 3). Therefore, this portion of Lodi's Declaration certifying and authenticating Nunnelly's administrative claim file does not constitute hearsay because it represents a verbal act bearing independent legal significance. *See United States v. Mena*, 863 F.2d 1522, 1531 (11th Cir. 1989) ("The portion of the document explicitly granting consent to board the [vessel] is not hearsay at all; but rather a verbal act, similar to the utterances involved in making a contract, to which the law attaches independent significance."); *United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003) ("According to the advisory committee, a 'verbal act' is a statement

that 'affects the legal rights of the parties.' Fed. R. Evid. 801 advisory committee's note. Such acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts.") (citing 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.11[3] (2d ed. 1997)); *Preferred Props., Inc. v. Indian River Ests., Inc.*, 276 F.3d 790, 799 n.5 (6th Cir. 2002) ("The verbal acts doctrine applies where 'legal consequences flow from the fact that words were said, e.g. the words of offer and acceptance which create a contract.'") (quoting Black's Law Dictionary 1558 (6th ed. 1990)) (citing 2 John W. Strong, McCormick on Evidence § 249, at 100–01 (5th ed. 1999)); 31A C.J.S. Evidence § 477 ("The 'verbal act' doctrine permits the admission of out-of-court unsworn statements or declarations in evidence for the purpose of showing that the words have been said by the declarant, as when the statement is an operative fact that gives rise to legal consequences or is a circumstance bearing on conduct affecting the parties' rights; verbal acts are not hearsay.").

Accordingly, for the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART** Nunnelly's Motion to Strike Affidavit and Portions of Affidavit of Richard Lodi. (Doc. 45).

### B. The Court Agrees with LINA's Decision Upon *De Novo* and Discretionary Review

Nunnelly protests that LINA improperly denied him benefits pursuant to the *de novo* standard of review, and urges the discretionary review standard retains no

application to his claim. Even applying the discretionary review standard, Nunnelly maintains, LINA arbitrarily and capriciously denied his claim. LINA contends the discretionary review standard properly applies to Nunnelly's claim, and asserts it reasonably denied him LTD benefits thereunder. As elaborated in the following discussion, the court concludes LINA did not wrongfully deny Nunnelly benefits pursuant to the *de novo* review standard. Further, the court agrees with LINA that pursuant to a proper application of the discretionary review standard, it did not unreasonably deny Nunnelly benefits.

As a preliminary matter, the court addresses Nunnelly's contention that LINA improperly failed to consider a Social Security Administration ("SSA") decision awarding him disability insurance benefits (SSDI). (Docs. 33 at 33 & 50 at 2). On February 5, 2020, the SSA issued a decision finding Nunnelly disabled as of January 18, 2017. (Doc. 37-4 at 1–6). Nunnelly maintains LINA's failure to consider the favorable decision contravened the Eleventh Circuit's dictates in *Melech v. Life Insurance Co. of North America*, 739 F.3d 663 (11ᵗʰ Cir. 2014). Nunnelly's argument fails.[21]

In *Melech*, the Court opined that as matter of procedural fairness, "an

---

[21] On July 9, 2020, the court issued a Memorandum Opinion and Order (the "prior Opinion") denying Nunnelly's Motion to Remand, in which he beseeched the court to remand his LTD claim to LINA to consider the favorable SSA decision. (Docs. 11, 18). Nunnelly advanced the same arguments in his Motion to Remand as he advances here. Thus, as portrayed in the following discussion, Nunnelly's instant contention fails for largely the same reasons discussed the court's prior Opinion.

administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process." *Melech*, 739 F.3d at 676.[22] The inquiry whether an administrator compiled a complete record and engaged in procedural fairness properly arises "antecedent to" the six-step sequential analysis, for, "as a matter of common sense, [the court] cannot evaluate [an administrator's] ultimate decision to deny a claim without first considering whether the record the administrator had before it was complete." *Boysen v. Ill. Tool Works, Inc.*, 767 F. App'x 799, 807 (11th Cir. 2019) (quoting *Melech*, 739 F.3d at 673) (original alterations omitted). Remand constitutes the appropriate remedy when an administrator denies a claim based upon an incomplete record. *See Melech*, 739 F.3d at 676 ("Because [the administrator's] decision to deny benefits here was based on an administrative record that did not contain the information from [the plaintiff's] SSA file, the proper course of action is to remand [her] claim to [the administrator] rather than to evaluate the merits of [her] claim for benefits under the Policy using evidence [the administrator] did not

---

[22] The issue in *Melech* concerned whether the administrator's failure to consider the plaintiff's favorable SSA decision warranted a remand of her benefits claim. The administrator denied the plaintiff's claim before the SSA adjudicated her application for disability insurance benefits, but with knowledge that her application remained pending. *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 669. During the administrative appeal, the SSA issued a decision finding the plaintiff disabled, but the administrator declined to review the SSA decision and materials during its review. *Id.* at 669–70. The administrative appeal resulted in a final denial of LTD benefits. *Id.* at 670. Upon reviewing the administrator's denial, the district court declined to consider the plaintiff's favorable SSA decision because the record before the administrator did not contain it. *Id.* at 671. Ultimately, the district court granted summary judgment to the administrator upon review of the administrator's decision and the administrative record.

consider."); *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001) ("[A]s a general rule, remand to the plan fiduciary is the appropriate remedy when the plan administrator has not had an opportunity to consider evidence on an issue.").

Nunnelly fails to demonstrate LINA reviewed his LTD claim via an incomplete administrative record or an unfair claim-evaluation process when it did not possess an SSA decision arising after its proceedings terminated. First, and significantly, the SSA decision did not exist during LINA's initial or appellate review of Nunnelly's claim. The SSA decision issued on February 5, 2020 – sixteen months after LINA issued its September 20, 2018, final decision denying Nunnelly's claim.[23] Therefore, LINA did not improperly "ignore" the SSA's favorable decision, and, therewith, adjudicate Nunnelly's claim via an incomplete record. *Melech*, 739 F.3d at 666; *see Cofield v. The Hartford*, 4:18-cv-00607-SGC, 2020 U.S. Dist. LEXIS 80663, at *18 (N.D. Ala. May 7, 2020) (the court declined to remand the plaintiff's claim to the administrator based upon an SSA decision that postdated the administrator's final denial) (citing *Ray v. Sun Life & Health Ins. Co.*, 752 F. Supp. 2d 1229, 1234 (N.D. Ala. 2010)); *accord White v.*

---

[23] In its prior Opinion, the court stated the SSA issued its decision seventeen months after LINA's final decision. (Doc. 18 at 2). The record did not contain Nunnelly's administrative record when the court rendered its Opinion. Thus, as noted in the Opinion, the court based the seventeen-month calculation only upon LINA's unopposed representation that the SSA's February 5, 2020, decision postdated LINA's final decision by seventeen months. (*Id.* at 2 n.2; doc. 13 at 3). Based upon Nunnelly's administrative record now exhibited before the court, the court discerns that the SSA's February 5, 2020, decision issued sixteen months after LINA's September 20, 2018, final decision.

*Hartford Life & Accident Ins. Co.*, No. 4:09-cv-02384-JEO, 2011 U.S. Dist. LEXIS 172097, at *2–6 (N.D. Ala. Oct. 26, 2011) (citing *Ray*, 752 F. Supp. 2d at 1234); *see also Ortiz v. Hartford*, No. 1:18-cv-00636-RB-KK, 2019 U.S. Dist. LEXIS 191084, at *12 (D.N.M. Nov. 4, 2019) ("[W]hen [SSA] decisions arise after the close of the ERISA record, there is nothing for the administrator to assess, and the administrator needn't reevaluate the ERISA claim."); *Griffin v. United of Omaha Life Ins. Co.*, No. 2:12-cv-03841-HGD, 2014 U.S. Dist. LEXIS 91790, at *18 (N.D. Ala. May 28, 2014) (declining to remand the plaintiff's benefits claim to the administrator based upon post-denial affidavits).

Furthermore, although Nunnelly applied for SSDI on February 16, 2018 – during LINA's appellate review of his claim – he presents no evidence that LINA disregarded his benefits application and the evidence pertaining to the SSA's claim evaluation. *See Melech*, 739 F.3d at 674. As elaborated in the court's prior Opinion, the procedural fairness principles articulated in *Melech* arose from the specific circumstances of the administrator's involvement in SSDI applications, and, more crucially, its particular review of the plaintiff's SSDI application:

> The administrator in *Melech*: effectively require[d] claimants to apply for SSDI benefits; discount[ed] any LTD benefits by any SSDI benefits received (or assumed as received if the claimant fails to apply for SSDI benefits); 'actively influence[d] the [SSDI] outcome and even reserve[d] the right to second guess the SSA'; arrange[d] for third parties to assist claimants in securing SSDI benefits; and compel[ed] claimants to exhaust

SSA appeals if they are denied SSDI benefits. [*Melech*, 739 F.3d] at 667–68, 674. '*Yet, once [the administrator] decided at first blush that [the plaintiff] had not provided enough medical evidence to support her claim, it treated the SSA process and the evidence generated by it as irrelevant and unavailable.*' *Id.* at 674. As the Court found, '[t]his treatment [was] internally inconsistent with [the administrator's] mode of evaluating claims.' *Id.*

(Doc. 18 at 5) (emphasis added).

Here, by contrast, Nunnelly does not present any evidence indicating LINA received and disregarded SSA records generated prior to its September 20, 2018, final decision. Indeed, in an August 23, 2018, letter – Nunnelly's last correspondence with LINA preceding its final decision – Nunnelly's counsel indicated he would "follow up with Mr. Nunnelly regarding the status of his Social Security claim" and represented that Nunnelly "ha[d] no additional medical evidence to submit." (AR 1245). The record portrays Nunnelly did not contact LINA again until March 11, 2019, when he submitted additional psychiatric records and indicated he had "not been awarded Social Security disability benefits." (AR 1302). Therefore, unlike the circumstances in *Melech*, the record does not portray LINA "ignored [Nunnelly's] [disability benefits] application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome." *Id.*

To be sure, based upon the Policy, LINA appears to maintain a similar position

vis-à-vis SSDI applications as the administrator maintained in *Melech*.[24]  The Policy

provides LINA: "may reduce the Disability Benefits by the amount of . . . any Social

Security disability . . . benefits"; "may help the Employee in applying for Social Security

Disability Income (SSDI) Benefits, and may require the Employee to file an appeal if it

believes a reversal of a prior decision is possible"; and "will reduce Disability Benefits

by the amount it estimates the Employee will receive, if the Employee refuses to

cooperate with or participate in the Social Security Assistance Program." (AR 0023–

24). Yet, notwithstanding any similarity or identicality between LINA's role in *Melech*

and its role here, the record nevertheless fails to portray that LINA steered Nunnelly to

the SSA and subsequently disregarded his favorable decision.[25]  Accordingly, contrary

to Nunnelly's contention, his "case is [not] exactly the same as *Melech*." (Doc. 33 at 33).

In sum, Nunnelly has not demonstrated procedural fairness, i.e., that LINA's

decision resulted from an incomplete administrative record or an unfair claim-

---

[24] LINA also constituted the administrator in *Melech*. *See Melech*, 739 F.3d at 665.

[25] The court cannot discern whether Nunnelly applied for SSDI on his own accord or at LINA's behest, and Nunnelly does not explain the circumstances of his SSDI application. *Compare* AR 1360 ("Call to Attorney, spoke with Emily, Assistant. . . . Regarding SSDI, Emily stated [Nunnelly] applied for SSDI . . . ."); *with* AR 1410 ("[LTD claim manager] told [Nunnelly] not to apply for SSDI . . . [Nunnelly] is recommended to apply for SSDI . . . ."). The record suggests that Nunnelly's private counsel, rather than LINA, assisted him in the SSA process. *See* AR 1245, 1302, 1360. Regardless, even assuming LINA "sent" Nunnelly to the SSA precisely as it "sent" the plaintiff to the SSA in *Melech*, the crucial point remains the record before LINA contained neither the SSA's favorable decision nor the supporting evidence when it issued its September 20, 2018, final decision. Thus, unlike in *Melech*, LINA did not "selectively use the results of the SSA process only to the extent that it serve[d] [its] interest to do so." *Melech*, 739 F.3d at 666.

evaluation process. Nunnelly thus again "misplaces his reliance upon *Melech*," (doc. 18 at 6), and fails to establish any error arising vis-à-vis his favorable SSA decision. The court therefore proceeds to review Nunnelly's claim pursuant to the six-step sequential framework set forth previously.

To recount, the first step of the analysis requires the court to "review the administrator's decision *de novo* for correctness: based on the evidence before the administrator at the time it made its decision, the court evaluates whether it would have reached the same decision." *Melech*, 739 F.3d at 673. LINA's decision passes muster under this review standard.

As discussed previously, to establish an entitlement to LTD benefits pursuant to the Policy, Nunnelly must demonstrate the continuous inability "to perform the material duties of his [job]" and to "earn 80% or more of his . . . [indexed earnings]" during the period January 18, 2017, to July 19, 2017. (AR 0006, 0022). Critically, although Drs. Rahim and Archibald prescribed Nunnelly work restrictions, none of Nunnelly's treating physicians or the medical reviewers deemed him continuously disabled through July 19, 2017.

As elaborated in the foregoing factual review, Drs. Rahim and Archibald constitute the only treating physicians who assessed Nunnelly with any work

restrictions.[26]  Dr. Rahim's most recent assessment appears in his March 19, 2017, Medical Request Form, in which he opined Nunnelly could return to work on June 1, 2017, with lifting, standing, and sitting restrictions.  (AR 0912).  Dr. Rahim's opinion thus does not support a finding that Nunnelly sustained a continuous disability through July 19, 2017.

Dr. Archibald's most recent assessment appears in his February 19, 2018, opinion that Nunnelly could not work due to severe hallucinations, panic, anxiety, and mood swings.  (AR 1193).  Significantly, however, Dr. Archibald based his opinion upon his June 5, 2017, examination of Nunnelly at Grand View Behavioral Center – after which date Nunnelly did not seek psychiatric treatment from Dr. Archibald or any other provider during the pertinent period.[27]  The eight-month lapse between Dr. Archibald's June 5, 2017, examination and his February 19, 2018, opinion appreciably diminishes the probative force of his work restriction.  Indeed, as recounted previously, Dr. Archibald noted during the June 5, 2017, examination that the decreased dosage of

---

[26] To recount, throughout the period July 2015 to April 2017, Dr. Horne Ballard routinely noted medication improved Nunnelly's pain and capacity for daily living activities, and she consistently encouraged him to exercise and maintain an active lifestyle.  (AR 1246–90).  The record portrays she did not render any opinion vis-à-vis Nunnelly's ability to work.

[27] As referenced previously, after Nunnelly's June 5, 2017, appointment with Dr. Archibald at Grand View Behavioral Health Center, Dr. Archibald commenced practice at Grayson & Associates, P.C.  On December 14, 2017, Grayson & Associates, P.C. notified LINA that no provider had treated Nunnelly to date.  (AR 0873).  The record portrays Nunnelly did not pursue treatment with Dr. Archibald again until June 2018.  (AR 1318).

Nunnelly's antipsychotic medication helped his audio/visual hallucinations. (AR 1001). Moreover, Dr. Archibald noted on June 5, 2017, that Nunnelly's hypersomnia precluded work; yet, in his February 19, 2018, opinion, Dr. Archibald attributed Nunnelly's restrictions to his hallucinations, panic, anxiety, and mood swings.

Based upon the foregoing incongruities, LINA permissibly concluded that Dr. Archibald's February 19, 2018, opinion failed to portray that Nunnelly sustained a continuously disabling psychiatric impairment during the pertinent period. *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008) (the district court properly affirmed the administrator's benefits denial on *de novo* review because although the physician opined the plaintiff could not work, he had not examined the plaintiff in over one year and his opinion conflicted with the independent peer review); *Disanto v. Wells Fargo & Co.*, No. 8:05-CV-1031-T-27MSS, 2007 U.S. Dist. LEXIS 62781, at *15 (M.D. Fla. Aug. 23, 2007) (the physician's work restriction did not support a finding of disability because the restriction accompanied a notation portraying the plaintiff's impairments had improved); *c.f. Brannon v. BellSouth Telecomms., Inc.*, 318 F. App'x 767, 772 (11th Cir. 2009) (The district court properly affirmed the administrator's benefits denial on *de novo* review in part because the licensed professional counselor's letter that the plaintiff's "symptoms have not improved in the last year and preclude her from working at any job" lacked evidentiary support, and merely summarized the plaintiff's

prior symptoms treatment history.); *Ramdeen v. Prudential Ins. Co. of Am.*, 163 F. Supp. 3d 1218, 1225–26 (M.D. Fla. 2016) (the administrator properly accorded little weight to the physician's no-work restriction because he did not elaborate upon the underlying impairment and did not provide additional information upon request); *Melech v. Life Ins. Co. of N. Am.*, No. 10-00573-KD-M, 2015 U.S. Dist. LEXIS 104898, at *67 (S.D. Ala. Aug. 10, 2015) (The physician's opinion that the plaintiff could not return to work did not support a finding of disability because the opinion lacked "any supporting documentation.").

As for the medical reviewers, only Mitchell and Dr. Topper assessed Nunnelly with vocationally restrictive limitations; neither, however, discerned limitations existing through July 19, 2017.[28] (AR 1242). Based upon her psychiatric specialization and

---

[28] As discussed previously, based upon Drs. Rahim's and Horne Ballard's treatment notes depicting Nunnelly's normal neurological exams and effective pain management, Dr. Jones determined Nunnelly did not manifest any functional limitations. (AR 1149).

In addition, because Dr. Archibald did not elaborate upon Nunnelly's audio/visual hallucinations, and he did not prescribe intensive psychiatric interventions at Nunnelly's most recent, June 5, 2017, appointment, Dr. Acenas opined that Nunnelly did not manifest a psychiatric impairment during the relevant period. (AR 1236–37). Nunnelly highlights that Dr. Acenas's report does not "mention" the records Nunnelly submitted from Dr. Horne Ballard on August 23, 2018. (Doc. 33 at 14). Although Dr. Acenas's report does not expressly reference Dr. Horne Ballard's records, in the "summary of records" section, Dr. Acenas specifically discussed Nunnelly's August 23, 2018, correspondence in which he enclosed Dr. Horne Ballard's records and noted he could not afford medical treatment due a lack of income. (AR 1236, 1245). Accordingly, Dr. Acenas appears to implicitly reference Nunnelly's August 23, 2018, evidentiary submission in summarizing Nunnelly's records – even if she did not do so explicitly.

Further, Dr. Acenas's report reflects a bullet-point list of "data reviewed," which does not identify Dr. Horne Ballard's records by name but contains several items that presumably embrace her records.

36

Nunnelly's pertinent medical records, Mitchell determined Nunnelly sustained a psychiatric functional impairment only through June 5, 2017, the date of Nunnelly's last appointment with Dr. Archibald. (AR 0319). Likewise, Dr. Topper reviewed Nunnelly's relevant records from the perspective of his neurology specialty, and he deemed Nunnelly neurologically limited only through April 19, 2017, the date of Nunnelly's last pain management appointment with Dr. Horne Ballard.[29] (AR 1242).

---

For example, the list references "Long Term Disability Letter and Complete Copies of Office Notes," and "Complete Copies of Office Visit Notes, Honeywell International 11/29/17." (AR 1235). Because these items reference "complete copies" of Nunnelly's treatment notes, the court presumes Dr. Horne Ballard's records comprised part of the evidence Dr. Acenas reviewed in rendering her September 13, 2018, report. Indeed, Dr. Topper's report expressly references Dr. Horne Ballard's records in the "summary of records" section; however, like the list printed on Dr. Acenas's report, the "data reviewed" list does not explicitly identify the records, but references "Long Term Disability Letter and Complete Copies of Office Notes," and "Complete Copies of Office Visit Notes, Honeywell International 11/29/17." (AR 1240). This similarity buttresses the court's presumption that although Dr. Acenas did not expressly discuss Dr. Horne Ballard's records, they nevertheless included the data she reviewed in rendering her opinion.

In any event, Dr. Horne Ballard's records do not undermine Dr. Acenas's opinion or render LINA's denial incorrect. As elaborated previously, Dr. Horne Ballard treated Nunnelly for pain – not his psychiatric symptoms – and she routinely noted Nunnelly's depression, anxiety, and/or bipolar remained "stable"; "better with medications"; or "stable and controlled per psychiatrist recommendations" prior to and during the penitent period. (AR 1259, 1263, 1265, 1267, 1269, 1271, 1273, 1275, 1277, 1279, 1281, 1283, 1285, 1287, 1289). Therefore, even if Dr. Acenas did not review Dr. Horne Ballard's records in rendering her opinion, LINA's decision remains nevertheless correct. *C.f. Miller v. PNC Fin. Servs. Grp.*, 278 F. Supp. 3d 1333, 1344–45 (S.D. Fla. 2017) (the defendant incorrectly denied the plaintiff's claim based in part upon independent medical expert reports that failed to address favorable evidence contradicting the experts' opinions).

[29] Nunnelly maintains Dr. Topper failed to heed the records he submitted from Dr. Horne Ballard on August 23, 2018. (Doc. 33 at 14). To the contrary, as discussed previously, Dr. Topper explicitly discussed Nunnelly's pain management treatment with Dr. Horne Ballard in rendering his opinion. More specifically, Dr. Topper observed that on April 19, 2017, Nunnelly "reported to pain management physician Gaylyn Horne-Ballard, M.D. [sic]," and Dr. Horne Ballard noted Nunnelly's pain was "improved" and "well controlled." (AR 1241–42). Nunnelly's contention thus stands

Thus, the opinions of the medical reviewers support LINA's finding that Nunnelly did not manifest a continuous disability through July 19, 2017.[30]

In summary, because the opinions of Nunnelly's treating physicians and the medical reviewers do not depict Nunnelly remained continuously unable to work throughout the period January 18, 2017, to July 19, 2017, the court does not find LINA wrongfully denied Nunnelly LTD benefits. *See Johnson v. AT&T Umbrella Ben. Plan No. 3*, No. 2:15-cv-01074-HNJ, 2018 U.S. Dist. LEXIS 3379, at *33–37 (N.D. Ala. Jan. 9, 2018) (the administrator did not wrongfully deny benefits because none of the physician advisors deemed the plaintiff disabled during the pertinent period); *accord Fife v. Coop. Benefit Adm'rs, Inc.*, No. 4:12-CV-3602-VEH, 2014 U.S. Dist. LEXIS 126253, at *62–68 (N.D. Ala. Sept. 10, 2014); *see also Fish v. Unum Life Ins. Co. of Am.*, No. 6:04-cv-1716-Orl-22JGG, 2005 U.S. Dist. LEXIS 29987, at *47–56 (M.D. Fla, Nov. 29, 2005) (the

---

baseless.

[30] To the extent Nunnelly contends LINA erred in its decision because "[t]he record reviewers never examined or even spoke to [him]," LINA did not improperly rely upon the reviewers' reports simply because they conducted paper reviews of Nunnelly's records. (Doc. 50 at 23). "[N]umerous cases have held that a plan administrator may appropriately rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports contradict the opinion of the treating physicians." *Brewer v. Hartford Life & Accident Ins. Co.*, No. CV-09-BE-0153-M, 2011 WL 13285141, at *14 (N.D. Ala. Sept. 30, 2011) (citing *Kiloh v. Hartfod Life Ins. Co.*, No. 8:04-cv-1741-T-24TGW, 2005 U.S. Dist. LEXIS 18681, at *41 (M.D. Fla. Aug. 31, 2005) (citing *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla 2004))). As elaborated previously, each reviewer constituted a board-certified specialist, and assessed Nunnelly's records from the perspective of his or her respective discipline. Nunnelly does not present any evidence undermining the reviewers' qualifications or any authority undermining the reliability of paper reviews. Accordingly, the reviewers' failure to examine or speak to Nunnelly does not mar their opinions or LINA's reliance thereupon.

court agreed with the administrator's benefits denial on *de novo* review because none of the plaintiff's treating physicians opined he could not work during the relevant 180-day elimination period).

Further, the medical records describing Nunnelly's ailments do not support a finding he sustained a continuous disability throughout the relevant period. As elaborated previously, Dr. Horne Ballard did not treat Nunnelly after April 2017; and she routinely noted Nunnelly effectively managed his pain with medication, and consistently advised him to exercise and remain as active as possible. (AR 1246–90). Dr. Horne Ballard also regularly noted that Nunnelly's psychiatric symptoms remained stable. (*Id.*) Relatedly, the record does not contain any records from Dr. Rahim beyond March 2017, and he opined that Nunnelly's migraines precluded work only as of June 2017. (AR 0891, 0912). Finally, based upon the afore-discussed inconsistencies, Dr. Archibald's February 2018 opinion that Nunnelly's psychiatric symptoms precluded work does not support a finding that Nunnelly sustained a continuous disability during the Elimination Period.[31]

---

[31] As referenced previously, Nunnelly submitted additional medical records from Dr. Archibald on March 11, 2019. (AR 1302). The records portray Dr. Archibald treated Nunnelly at Grayson & Associates, P.C. in June, August, and November 2018, and February 2019. (AR 1303–25). LINA notified Nunnelly it would not regard the submission as a second-level appeal, and thus did not review the records. In opposing LINA's Motion, Nunnelly contends LINA "was . . . required to consider" Dr. Archibald's Grayson & Associates, P.C. records. (Doc. 50 at 2). Nunnelly does not cite any authority to support his proposition, nor does the court discern the existence of the same. LINA's September 20, 2018, affirmance letter notified Nunnelly he must "[s]ubmit [an] appeal letter" to initiate

Accordingly, while the medical records portray Nunnelly's migraines, pain, and psychiatric impairments were disabling at certain points during the Elimination Period, LINA correctly determined Nunnelly did not establish such impairments remained continuously disabling from January 18, 2017, to July 19, 2017.[32] *See Benson v. Hartford*

_____

a second appeal. (AR 1293). And, to recount, Nunnelly's March 11, 2019, letter does not contain an appeal request, but rather merely references his lack of Social Security disability benefits; specifies the dates of Dr. Archibald's Grayson & Associates, P.C. records; and states he "[has] no additional records to submit." (AR 1302). Thus, on March 20, 2019, LINA notified Nunnelly it "[was] unable to consider [his] appeal . . . since [he] [did] not provide[] a formal written request to appeal the September 20, 2018 appeal affirmation." (AR 1326). Based upon the language in LINA's September 20, 2018, affirmance letter and March 20, 2019, correspondence, LINA properly applied its second-level appeal procedures to Nunnelly's claim – and Nunnelly does not specifically argue otherwise. Accordingly, LINA's construction of Nunnelly's March 11, 2019, letter and its failure to consider Dr. Archibald's Grayson & Associates, P.C. records does not render its decision incorrect.

Furthermore, because the records depict Nunnelly's psychiatric treatment in 2018 and 2019, they bear little relevance upon whether he sustained a disabling psychiatric impairment during the period January 18, 2017, to July 19, 2017. *See Disanto v. Wells Fargo & Co.*, No. 8:05-CV-1031-T-27MSS, 2007 U.S. Dist. LEXIS 62781, at *26 (M.D. Fla. Aug. 23, 2007) (evidence vis-à-vis the plaintiff's nerve block and trigger point injections did not undermine the administrator's benefits denial because the injections postdated the pertinent elimination period); *Thomas v. Lockheed Martin Info. Sys.*, 155 F. Supp. 2d 1316, 1322 (N.D. Fla. 2001) ("The evidence in the record seems to indicate that the [plaintiff's] mental condition may have become more severe during the mid and later months of 1998. However, the fact that [the plaintiff] may have become disabled a few weeks or a few months after March 17, 1998, does not change the fact that there was little or no credible evidence of such a disability as of March 17, 1998.").

[32] According to Nunnelly, LINA "admitted" he manifested a disability because it paid him a sum in satisfaction of his prior STD benefits claim. (Doc. 50 at 41). Nunnelly overstates the import of LINA's payment. As referenced previously, LINA resolved Nunnelly's STD claim via settlement of a lawsuit Nunnelly initiated after LINA denied his claim. Thus, the record portrays LINA determined Nunnelly *did not* sustain a disability pursuant to its STD benefits policy, and the record contains no evidence LINA conceded otherwise or admitted liability by ultimately agreeing to resolve Nunnelly's civil claim via settlement.

Regardless, Nunnelly does not explain – nor does the record illuminate – how any eligibility for STD benefits necessarily establishes an entitlement to LTD benefits. Therefore, Nunnelly fails to demonstrate how LINA's payment on Nunnelly's STD claim undermines the propriety of its adverse

*Life & Accident Ins. Co.*, 791 F. App'x 152, 155 (11ᵗʰ Cir. 2019) (The district court

properly affirmed the administrator's benefits denial on *de novo* review because the

records depicted the plaintiff sustained a disability for only "a short period of time"

during the applicable elimination period.); *Ramdeen*, 163 F. Supp. 3d at 1225 (although

the plaintiff sustained vocational limitations arising from a prior stroke, the evidence

failed to depict the presence of a disability during the subsequent, pertinent period);

*Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11ᵗʰ Cir. 1998) (A plaintiff

challenging a benefits denial "bears the burden of proving his entitlement to contractual

benefits.").[33]

---

LTD determination. *See Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 265 (11ᵗʰ Cir. 2007) ("We have never held that [prior payment of disability benefits] is a relevant consideration when we review the denial of benefits under ERISA."); *Campbell v. United of Omaha Life Ins. Co.*, No. 2:14-cv-00623-JEO, 2015 U.S. Dist. LEXIS 136024, at *40–42 (N.D. Ala. Oct. 6, 2015) (The defendant did not conclusively determine the plaintiff manifested a disability simply because it paid him for a limited period while it reviewed his STD claim, and its award of "an initial period of STD benefits did not preclude it from later determining [the plaintiff] was not entitled to any further benefits.") (citing, *inter alia*, *Stiltz*, 244 F. App'x at 265).

[33] Nunnelly does not expressly beseech the court to consider his favorable SSA decision in the instant assessment, though, he included the decision in the evidentiary submission he filed in conjunction with his Motion. (Doc. 37-4). The Eleventh Circuit recognized that "[a] district court may consider the [SSA's] determination of disability" when conducting a *de novo* review of an administrator's benefits denial. *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789, 790 n.32 (11ᵗʰ Cir. 1994). Nevertheless, "the court is not bound to do so," *Ruple v. Hartford Life & Accident Ins. Co.*, 340 F. App'x 604, 612 (11ᵗʰ Cir. 2009), and the provision of Social Security disability benefits bears no dispositive affect upon an administrator's disability determination. *See Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11ᵗʰ Cir. 1999); *Ray v. Sun Life & Health Ins. Co.*, 443 F. App'x 529, 533 (11ᵗʰ Cir. 2011). Courts thus do not accord SSA decisions any particular deference or weight, as the presumptions embodied in the SSA's five-step, disability determination "inevitably simplify, eliminating consideration of many differences potentially relevant to an individual's ability to perform a particular job." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801, 804 (1999).

Even if LINA's decision was "*de novo* wrong," the afore-discussed evidence nevertheless furnishes "'reasonable' grounds" supporting the denial pursuant to the arbitrary and capricious standard of review. *Blankenship*, 644 F.3d at 1355.

Nunnelly argues the arbitrary and capricious standard of review remains inapplicable because the Policy contains "no effective grant of discretionary authority to LINA." (Doc. 50 at 7) (emphasis omitted). As elaborated previously, courts apply the arbitrary and capricious standard only if the plan or policy vests the administrator with discretion in reviewing claims. *Id.* "This grant of discretion must be apparent

---

In this case, the SSA determined Nunnelly sustained a disability as defined by the pertinent regulations based upon his psychiatric impairments. (Doc. 37-4 at 4–6). In rendering its decision, the SSA noted Nunnelly's "protracted care" with Dr. Archibald, as portrayed in his treatment records from the period 2009 to 2019. (*Id.* at 5). The SSA also heeded Dr. Archibald's February 19, 2018, opinion, highlighting that "Dr. Archibald found [Nunnelly's] condition had not improved more than twelve months after [January 18, 2017]]." (*Id.*) The SSA's evaluation of Nunnelly's psychiatric impairments does not alter the court's assessment of LINA's benefits denial. Because Nunnelly bore the burden of demonstrating a continuous disability from the period January 18, 2017, to July 19, 2017, to establish an entitlement to LTD benefits – a burden he did not bear before the SSA – the court nevertheless agrees with LINA's assessment of Dr. Archibald's February 19, 2018, opinion and its ultimate determination that Nunnelly failed to satisfy the twenty-six week Elimination Period.

Furthermore, and notably, although a court must generally accord special weight to the opinions of a claimant's treating physician in social security cases, the same deference does not apply to disability determinations under employee benefit plans governed by ERISA. *See Black & Decker v. Nord*, 538 U.S. 822, 825 (2003). Accordingly, the court concludes LINA did not incorrectly deny Nunnelly's claim, the SSA's determination notwithstanding. *See Stewart v. Hartford Life & Accident Ins. Co.*, No. 2:17-CV-01423-KOB, 2021 U.S. Dist. LEXIS 87002, at *80–81 (N.D. Ala. May 6, 2021) (the SSA's favorable decision did not render erroneous the administrator's benefits denial because the policy subjected the plaintiff to a more exacting burden); *Foglia v. Reliance Standard Life Ins. Co.*, No. 2:17-cv-97-FtM-99MRM, 2018 U.S. Dist. LEXIS 155565, at *34–36 (M.D. Fla. July 24, 2018) (the plaintiff's favorable SSA decision did not render erroneous the administrator's benefits denial in part because the decision rested upon evidence chronologically immaterial to the administrator's assessment).

from the text of the [p]lan." *Pierce v. Wyndham Worldwide Operations, Inc.*, 791 F. App'x 45, 49 (11th Cir. 2019) (citing *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) ("This circuit has interpreted [Supreme Court precedent] to mandate *de novo* review unless the plan expressly provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms.")).

Here, the Policy expressly vested LINA with discretionary authority to make LTD eligibility determinations via the following provision:

> [Honeywell] has appointed [LINA] as the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. [LINA] shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by [LINA] shall be final and binding on Participants and Beneficiaries to the full extent permitted by law.

(AR 0086).

This provision plainly grants LINA discretion to adjudicate LTD claims, and, therewith, triggers application of the arbitrary and capricious standard. *See Langford v. Unum Life Ins. Co. of Am.,* 138 F. App'x 162, 164 (11th Cir. 2005) (Because the plan provided that the defendant "shall have the final authority to determine whether or not to pay any claims that [the insurer] recommends for payment or denial[,] and shall have the final authority to authorize payment of claims," the defendant possessed discretionary authority to make eligibility decisions); *Kirwan*, 10 F.3d at 788 ("[The

Eleventh Circuit] has applied the arbitrary and capricious standard when the plan provides that the administrators' 'determinations shall be final and conclusive' 'so long as they are' 'reasonable determinations which are not arbitrary and capricious[;]' . . . [or] when the plan confers upon the administrator 'full and exclusive authority to determine all questions of coverage and eligibility' and 'full power to construe the provision' of the plan.").

Furthermore, as LINA highlights, the Policy states the employee "must provide [LINA], at his or her expense, satisfactory proof of Disability before benefits will be paid." (AR 0022). Pursuant to binding Eleventh Circuit precedent, the Policy's "satisfactory proof" language conferred discretionary authority upon LINA to make eligibility determinations. *See Levinson*, 245 F.3d at 1325 (The policy's requirement that an employee submit "satisfactory proof" of disability conferred discretionary authority upon the administrator.); *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1233–34 (11th Cir. 2006) (*Levinson* compelled the conclusion that based upon the employee's requirement to submit "satisfactory proof" of disability, the administrator retained discretionary authority.); *see also Carr v. John Hancock Life Ins. Co. (USA)*, 703 F. App'x 733, 741 (11th Cir. 2017) (The policy's requirement that a claimant "must submit 'Proof of Claim satisfactory to Us'" conferred discretionary authority upon the administrator.) (citing *Tippitt*, 457 F.3d at 1233–34). Accordingly, because the Policy expressly granted

44

LINA discretionary authority to render eligibility determinations, the court may properly assess LINA's decision pursuant to the arbitrary and capricious standard. *See Harvey v. Standard. Ins. Co.*, 850 F. Supp. 2d 1269, 1282–83 (N.D. Ala. 2012) (the plan expressly and unambiguously conferred discretionary authority upon the administrator via a provision providing the administrator retained the authority to make eligibility decisions, and to determine the amount of benefits payable and the sufficiency of the information required to establish an entitlement to benefits).

Nunnelly appears to contend the arbitrary and capricious standard does not apply because Cigna, rather than LINA, decided his claim, and the Policy lacks any language conferring discretionary authority upon Cigna. (Doc. 50 at 14). As elaborated at the outset, however, Cigna did not adjudicate Nunnelly's claim. LINA rendered the decision denying Nunnelly's claim, and, as its letters to Nunnelly explained, it simply used the "Cigna" and "Tree of Life" registered service marks on its correspondence. *See e.g.*, AR 1184, 1291. Nunnelly's arguments vis-à-vis Cigna thus remain unavailing.

Nunnelly further attempts to shield his claim from the arbitrary and capricious standard by contending LINA violated the following "major provisions" of the Department of Labor's Claims Procedure for Plans Providing Disability Benefits rule:

1. Claims and appeals must be adjudicated in a manner designed to ensure independence and impartiality of the persons involved in making the benefit determination.

2. Benefit denial notices must contain a complete discussion of why the plan denied the claim and the standards applied in reaching the decision, including the basis for disagreeing with the views of health care professionals, vocational professionals, or with disability benefit determinations by the Social Security Administration (SSA).

3. Claimants must be given timely notice of their right to access to their entire claim file and other relevant documents and be guaranteed the right to present evidence and testimony in support of their claim during the review process.

4. Claimants must be given notice and a fair opportunity to respond before denials at the appeals stage are based on new or additional evidence or rationales.

5. Plans cannot prohibit a claimant from seeking court review of a claim denial based on a failure to exhaust administrative remedies under the plan if the plan failed to comply with the claims procedure requirements unless the violation was the result of a minor error.

6. Certain rescissions of coverage are to be treated as adverse benefit determinations triggering the plan's appeals procedures.

7. Required notices and disclosures issued under the claims procedure regulation must be written in a culturally and linguistically appropriate manner.

*See* doc. 33 at 2–3 (quoting Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92316 (Dec. 19, 2016) (codified at 29 C.F.R. § 2560.503-1)).

However, pursuant to 29 C.F.R. § 2560.503-1, the provisions Nunnelly latches upon "apply to claims for benefits filed under a plan after April 1, 2018." 29 C.F.R. § 2560.503-1(p)(3). Because Nunnelly initiated his LTD claim in November 2017, these provisions would afford him no refuge even if he could demonstrate a violation thereof.

Nunnelly suggests that even under the arbitrary and capricious standard, LINA unreasonably denied benefits because it improperly discredited his treating physician's opinions. (Docs. 33 at 17; 50 at 23). Yet, ERISA appeals do not afford any special deference to the opinions of treating physicians over other types of evidence. *See Black & Decker v. Nord*, 538 U.S. 822, 825 (2003) ("[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."); *Sobh v. Hartford Life & Accident Ins. Co.*, 658 F. App'x 459, 465 (11th Cir. 2016) ("ERISA claim administrators need not accord extra respect to the opinions of a claimant's treating physicians, but rather may credit independent medical opinions.") (internal quotations omitted).

Nunnelly does not elaborate which treating physicians' opinions LINA improperly considered, but, in any event, LINA reasonably credited the opinions of record. To revisit, Dr. Topper credited Dr. Rahim's no-work restriction through April 19, 2017, the date of Nunnelly's last pain-management treatment during the pertinent period. LINA reasonably relied upon Dr. Topper's assessment because, as discussed previously, Nunnelly failed to produce any records depicting the status of his neurological impairments and associated pain after April 19, 2017. *See Tookes v. Metro. Life Ins. Co.*, No. 1:04-CV-1957-RWS, 2006 U.S. Dist. LEXIS 19416, at *43 n.12 (N.D. Ga. Mar. 31, 2006) ("[T]he existence of a substantial 'gap' in Plaintiff's evidence of disability left [the administrator] with a reasonable basis on which to conclude that she

had not provided 'ongoing certification of disability' as required by the Plan.").

Relatedly, as recounted previously, Dr. Acenas discredited Dr. Archibald's February 19, 2018, opinion that Nunnelly sustained work-preclusive psychiatric impairments based upon his June 5, 2017, evaluation. Dr. Acenas also noted that according to Dr. Archibald's June 5, 2017, treatment notes, Nunnelly's psychiatric symptoms did not require the intensive inpatient or outpatient interventions that generally denote the existence of a disabling psychiatric impairment. LINA sensibly relied upon Dr. Acenas's assessment because, as recounted previously, the eight-month lapse in treatment undermined Dr. Archibald's opinion, and his opinion did not accord with his June 5, 2017, treatment notes. *See Brannon*, 318 F. App'x at 771 (because the licensed professional counselor did not provide examples of how the plaintiff's symptoms precluded her from working, the peer reviewer properly determined the plaintiff did not manifest a disabling psychological impairment); *Muzyka v. UNUM Life Ins. Co. of Am.*, 195 F. App'x 904, 909 (11th Cir. 2006) (The medical reviewer's opinion that the plaintiff's "limited medical care did not conform to the usual standards for someone suffering with" her impairments supported the administrator's denial upon *de novo* review.); *Harper v. Prudential Ins. Co. of Am.*, No. CV 109-12, 2010 U.S. Dist. LEXIS 165517, at *27 (S.D. Ga. July 8, 2010) (The independent medical reviewer appropriately "took issue with what was not" depicted in the treating physician's records vis-à-vis the

plaintiff's impairments; thus, the reviewer's assessment that the plaintiff did not manifest a disability supported the administrator's benefits denial).

In essence, because no treating physician opined that Nunnelly's impairments continuously precluded work during the period January 18, 2017, to July 19, 2017, Nunnelly fails to demonstrate LINA unreasonably evaluated the opinions of record. *See Dawson v. Cigna Corp.*, 261 F. Supp. 3d 1275, 1293 (S.D. Fla. 2017) (the administrator reasonably denied benefits because although some treating physicians imposed work restrictions, none opined that the plaintiff sustained a continuous disability throughout the elimination period); *Germaine v. Unum Life Ins. Co. of Am.*, No. 2:03-cv-0104-WCO, 2004 U.S. Dist. LEXIS 24019, at *28–29 (N.D. Ga. Sept. 23, 2004) (the administrator reasonably denied the plaintiff's LTD claim based upon the independent medical reviewers' opinions that she did not manifest a continuously disabling impairment during the elimination period); *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) ("It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled.").

Finally, Nunnelly fails to establish LINA operated under a conflict of interest marring the reasonableness of its decision pursuant to the final steps of the sequential framework. *See Blankenship*, 644 F.3d at 1355. Nunnelly contends – and LINA does

not appear to dispute – LINA operated under a conflict of interest because it "has the authority to approve [and pay] benefits." (Doc. 33 at 35); *see* doc. 36 at 25 (LINA references "the fact that [it] both pays claims and makes claims decision under the Plan."). The pertinent inquiry, therefore, concerns whether LINA's conflict of interest alters the court's assessment that LINA reasonably denied Nunnelly benefits. *See Blankenship*, 644 F.3d at 1355 ("If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious."); *Doyle v. Liberty Life Assur. Co.*, 542 F.3d 1352, 1360 (11th Cir. 2008) ("The only remaining step in the [sequential] analysis [is] to determine whether [the defendant's] conflict of interest tainted its decision, thereby rendering its otherwise reasonable decision unreasonable."). The court concludes it does not.

At the final step of the sequential framework, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (quoting *Doyle*, 542 F.3d at 1360). Moreover, because the existence of a conflict of interest constitutes "an unremarkable fact in today's marketplace," *Blankenship*, 644 F.3d at 1356, the plaintiff must establish the "inherent or case-specific importance" of the conflict. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Accordingly, the plaintiff must do more than simply "point out a potential conflict of interest" to demonstrate unreasonableness. *Bowman v. Reliance Standard Life Ins. Co.*, No. 2:11-cv-1046-ALB, 2019 U.S. Dist. LEXIS 116110, at *11 (M.D. Ala. July 12, 2019).

Nunnelly does not elaborate how LINA's conflict of interest tainted its eligibility decision, and thus he fails to establish the conflict rendered LINA's decision arbitrary and capricious. Nunnelly's filings simply highlight the existence of LINA's conflict, and do not contain any discussion of how such conflict inherently or specifically marred its decisionmaking.[34] Therefore, because Nunnelly merely identified a conflict of

---

[34] Nunnelly contends, without more, that "Dr. Jones is the Medical Director for CIGNA and has a conflict of interest." (Docs. 33 at 25 & 50 at 37). Absent any explanation or evidence vis-à-vis how Dr. Jones's position (with LINA, not "CIGNA") manifested a conflict of interest that tainted LINA's adjudication, Nunnelly fails to establish that Dr. Jones's review undermined the reasonableness of LINA's denial.

As recounted previously, Dr. Jones concluded Nunnelly did not exhibit any functional limitations based upon Dr. Rahim's normal neurological examinations; Dr. Horne Ballard's observation that medication controlled Nunnelly's pain; and her recommendation that he maintain an active lifestyle. (AR 1149). Nunnelly contends Dr. Jones "only reviewed two sets of medical records" from Drs. Rahim and Horne Ballard. (Docs. 33 at 25 & 50 at 37). Yet, as Nunnelly also acknowledges, the records Dr. Jones reviewed constituted "the medical records available at the time." (Docs. 33 at 25 & 50 at 37); *see* AR 1148 ("I [Dr. Jones] have reviewed all available medical and/or vocational evidence[] for which I have been trained."). Nunnelly thus fails to illuminate any inconsistencies in Dr. Jones's review. Furthermore, as LINA highlights, it employed Drs. Acenas and Topper to review Nunnelly's claim on appeal – both of whom constitute independent medical specialists and reviewed Nunnelly's records "anew." (Doc. 49 at 16). Therefore, Dr. Jones's review does not alter the court's conclusion that reasonable grounds buttress LINA's benefits denial. *See Tyrell v. Aetna Life Ins. Co.*, No. 1:07-cv-526-ODE, 2009 U.S. Dist. LEXIS 141744, at *34–35 (N.D. Ga. Oct. 30, 2009) (the plaintiff failed to establish the administrator's medical director conducted a tainted evaluation because the medical director based his conclusions upon the plaintiff's medical records and other evidence); *Sanders v. UNUM Life Ins. Co. of Am.*, No. 3:08-CV-03(CDL), 2009 U.S. Dist. LEXIS 27176, at *29 (M.D. Ga. Mar. 30, 2009) ("Reliance upon in-house medical consultants who base their evaluations on a review of medical and vocational records is not, standing alone, an abuse of discretion.").

interest without establishing its effect upon his claim, "this factor cannot carry much weight," and Nunnelly fails to demonstrate LINA's conflict displaced the reasonableness of its decision. *Bowman*, 2019 U.S. Dist. LEXIS 116110, at *11.

Further, the court does not discern the existence of any evidence indicating LINA denied Nunnelly benefits based upon improper financial incentives or other self-interested motives. *See Glenn*, 554 U.S. 105 at 112; *Williams v. Hartford Life & Accident Ins. Co.*, No. 8:02-CV-85-T-17MAP, 2010 U.S. Dist. LEXIS 12528, at *32 (M.D. Fla. Feb. 12, 2010) (The court noted that notwithstanding any conflict of interest, the record did not depict "any evidence of the payment of improper financial incentives, of a pattern or practice of unreasonably denying meritorious claims, of reliable evidence that was disregarded, or of the production of only selective medical evidence."). Accordingly, LINA's conflict of interest does not alter the court's conclusion that LINA reasonably denied Nunnelly's claim. *See Harvey*, 850 F. Supp. 2d at 1292 ("To the extent any conflict existed, [the plaintiff] has not met her burden of establishing persuasive indicators that the conflict so tainted [the administrator's] decision such as to render it arbitrary and capricious.").

## CONCLUSION

Based upon the foregoing analysis, the court **GRANTS** LINA's Motion for Summary Judgment; **DENIES** Nunnelly's Motion for Judgment on LTD Benefits for

Inability to Perform Own Occupation; and **DISMISSES** this action with prejudice.

The court further **GRANTS IN PART** and **DENIES IN PART** Nunnelly's Motion

to Strike Affidavit and Portions of Affidavit of Richard Lodi. The court will enter a

separate final judgment in accordance with this Memorandum Opinion.

      **DONE** and **ORDERED** this 7th day of July, 2021.

                                           HERMAN N. JOHNSON, JR.
                                           UNITED STATES MAGISTRATE JUDGE